Kimberly A. Deater
Law Office of Kimberly Deater
505 W. Riverside Avenue, Suite 500
Spokane, WA  99201
(509) 995-4113

Attorney for Lawson


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-08-0026-FVS-1 |
| Plaintiff, | DEFENDANT'S SENTENCING MEMORANDUM AND RESPONSE TO GOVERNMENT'S NOTICE OF REVIEW OF PSR |
| vs. | |
| GYPSY LAWSON, | |
| Defendant | |

   Defendant, Gypsy Lawson, through undersigned counsel, moves the Court for a sentence of probation for a term of one year on each count to run concurrently, to impose no fine, and to impose no restitution.  Ms. Lawson submits the following memorandum[1]

---

[1]  All concessions and admissions in this memorandum are based upon the trial evidence seen in the light most favorable to the Government. No statement in this document is meant as an admission for the Government's use at a subsequent trial.  Ms. Lawson submits this sentencing memorandum prior to the Court's ruling on her Motion for Judgment of Acquittal per the Court's order.

in support of her sentencing requests as well as her Response to the Government's Notice of Review of Presentence Investigation Report (PSR):

**DISCUSSION**

In *United States v. Carty*, 520 F.3d 984 (en banc) (9th Cir. 2008), the Ninth Circuit reviewed the three *post-Booker* Supreme Court opinions in order to clarify the requirements for the district courts' determination of a "reasonable sentence" within the circuit.[2] The <u>Carty</u> court echoed the Supreme Court's dictate that "[a]ll sentencing proceedings are to begin by determining the applicable Guidelines range," as it is the "starting point and initial benchmark," the district court "may not presume that the Guidelines range is reasonable," "…nor should the Guidelines factor be given more or less weight than any other ." *Id*. at 991.

The *Carty* court reiterated that "under the Booker remedial regime" it is well settled that…. the Guidelines are no longer mandatory but rather only advisory. *Id*. The court went on to state that:

> "The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a) and (a)(2).

*Id*.

Moreover, the *Carty* court distilled the holdings of *Booker*, *Rita*, *Gall*, and *Kimbrough* into the following directives for district courts within the circuit:

---

[2] *Gall v. United States*, __ U.S. __, 128 S.Ct. 586 (2007), *Rita v. United States*, 551 U.S. __, 127 S.Ct. 2456(2007), *Kimbrough v. United States*, __ U.S. __, 128 S.Ct. 558 (2007).

- All sentencing proceedings are to begin with a determination of the correct Guidelines range.
- The parties must be given a chance to argue for the sentence they believe is appropriate.
- The district court should then consider all §3553(a) factors to decide if they support the sentence requested by the parties.
- The district court may not presume the Guidelines range is reasonable, in fact, the district court may not give more or less weight to the Guidelines factor than any other.
- The sentencing court must make an individualized determination based on all facts, but is not required to raise every possibly relevant issue *sua sponte*.
- If a district judge "decides that an outside Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."
- Once the district court has made a sentencing determination, it must explain it sufficiently to permit meaningful appellate review.
- Appellate review is to determine whether the sentence is reasonable; only a procedurally erroneous or substantively unreasonable sentence will be set aside.
- The abuse of discretion standard applies to all sentencing decisions, whether inside or outside of the Guidelines range.
- Procedural error includes failure to correctly calculate the Guidelines range, to treat the Guidelines as mandatory, to fail to consider the 3553(a) factors or to choose a sentence based on clearly erroneous facts, or to fail

to adequately explain the sentence, including any deviation from the
Guidelines range

- Substantive reasonableness is determined considering the totality of the
circumstances, including the degree of variance; there is no appellate
presumption of reasonableness for a sentence within the Guidelines
range.

- Due deference is given to the district court's decision that the 3553(a)
factors, on a whole, justify the extent of the variance.

- The district court will not be reversed just because the appellate court
"think[s] a different sentence is appropriate.

*Id*.

Based upon these directives, the factors set forth in 18 U.S.C. § 3553(a) and
the files contained herein, Ms. Lawson submits that a sentence of one year of
probation, no fine, and no restitution is the appropriate sentence.

## I.    GUIDELINE CALCULATION

Ms. Lawson agrees with the PSR in that her guideline range is 0 – 6 months.
This range is based upon a Criminal History Category I and an Offense Level of 8.
Ms. Lawson submits that this guideline range is reasonable in this case as it
includes a sentence of probation.  The Government argues that, "[T]his offense
level does not adequately take into consideration the offense conduct, and would
therefore argue at a minimum, the high end of the offense level be imposed for
reasons which will be further argued below and at sentencing." *Government's
Notice of Review of Presentence Investigation Report, Ct. Document No. 269*, p. 3,
lines 3-6. (Herein after referred to as NRPSR).

However, prior to trial in this case, the Government offered to dismiss one
count of the superseding indictment and to recommend no jail time in exchange for
Ms. Lawson's plea of guilt to one felony count.  Ms. Lawson submits that her

offense conduct has not changed from the time of the Government's plea offer to the present and the only intervening event in that time was the jury trial. However, the fact that Ms. Lawson's case went to trial does not change her ultimate guideline range of 0 – 6 months. The only arguable change in her guideline calculation is an increase of two offense levels for putting the Government to its burden taking her from an offense level of 6 to 8. Again, her range is the same regardless of whether the offense level is "6" or "8." It appears the Government is arguing that Ms. Lawson receive at least 6 months in jail, a $10,000 fine, and a restitution order now because Ms. Lawson put the Government to its burden. This is not a legitimate, nor a legal reason to imprison an individual.

Under the legitimate 3553(a) analysis, Ms. Lawson submits that the imposition of a sentence of probation is a reasonable sentence.

## A. Offense Level/Acceptance of Responsibility

The total offense level is 8. While it is arguable that the 2-level adjustment for acceptance of responsibility does not apply because the government was put to its burden of proof at trial, there is an argument that the 2-level downward adjustment should apply.

In this case, Ms. Lawson did not agree to plead guilty to a felony because, for a variety of reasons, she believed, and still does, her criminal liability in this district amounted to only a misdemeanor offense. Further, during plea negotiations, Ms. Lawson requested that the Government allow her to plead to a misdemeanor; the Government refused.

Conviction by trial does not automatically preclude a defendant from consideration for a reduction for acceptance of responsibility. U.S.S.G. § 3E1.1, *Application Note* 2. In fact, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt the reduction may still apply. *Id*. For

example, where a defendant goes to trial to preserve issues related to constitutional challenges of a statute or the application of the statute to her conduct. *Id*.

In this case, Ms. Lawson never took the stand to deny her criminal conduct. Conduct resulting in an enhancement under section 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for her criminal conduct. U.S.S.G. §3E1.1, *Application Note 4*. Ms. Lawson also requested a lesser-included jury instruction on the misdemeanor, and as this Court is no doubt aware, she has filed at least ten briefings related to deficiencies in the indictment and other jurisdictional issues. *See Court Document Numbers*, 66, 67, 85, 177, 178, 184, 187, 196, 232, and 249.

When an individual has is at the mercy of the Government's discretionary charging powers and has no avenue to force the Government to charge an offense differently prior to trial, there is no choice but to go to trial in order to preserve issues of contention. There is no mechanism for summary judgment in federal criminal proceedings and Ms. Lawson should not be punished for this deficiency in the procedural rules.

Ms. Lawson did not object to the PSR on this issue because it has no effect on her guidelines' range. However, Ms. Lawson makes this point now, in light of the Government's request for an upward departure, and submits it is a factor to be weighed as part of the Court's 3553(a) analysis.

**B.    Fine**

The Government asks the Court to impose a $10,000 fine, the maximum under the guidelines, but offers no logical reason for the imposition of such a heavy fine. *NRPSR*, pgs. 3-4. As the guidelines state, "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. §5E1.2 (a). As set forth in the PSR, Ms. Lawson does not have the means to obtain the funds the

Government seeks to extract from her. Further, given her education, and disabilities, it is unlikely that Ms. Lawson would have access to that kind of money anytime in the foreseeable future.

The Government argues for the maximum fine and for an upward departure from the guidelines and claims Ms. Lawson's "selfish need to bring home an exotic pet," as the basis for these harsher punishments. *NRPSR*, p. 4, lines 13 – 17.

The Government seeks to punish Ms. Lawson, but the punishment the Government seeks is not commensurate with the offense.

**C.  Restitution**

Ms. Lawson agrees with the PSR that restitution is not an issue. 18 U.S.C. §3663(a)(1)(B)(i) states, in pertinent part:

> The court, in determining whether to order restitution under this section, shall consider –
>
> (I)  the amount of the **loss** sustained by each **victim** as a result of the offense, and,
>
> (II)  the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependants, and such other factors as the court deems appropriate.

Further, the term "victim" is a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered. 18 U.S.C. § 3663(a)(2).

In determining whether or not the Court may even award restitution to the Government, the issues to be resolved are; (1) whether the United States is a "victim," (2) if so, did it incur a "loss," and (3) was the loss a "result" of the offense.

*Government as Victim*

The Government cited over a dozen cases from other circuits for the proposition that the Government "could" be a victim for the purposes of section 3663. However, none of these cases are analogous to the facts in this case and therefore, not helpful. In most of the cited cases, various governmental agencies suffered losses as a direct result of the offense charged. For example, in *United States v. Martin*, 128 F.3d 1188 (7th Cir. 1997), the defendant was convicted for fraudulently receiving approximately 40,000 dollars in welfare benefits from the Illinois Department of Public Aid and the government sought restitution. In *United States v. Clark*, 957 F.2d 248 (6th Cir. 1992), the defendant was charged with stealing two cars from the F.B.I. and the government sought restitution for the cars. In another case the government cited, *United States v. Gall*, 21 F.3d 107 (6th Cir. 1994), the court did not even award restitution as it held that the word "harm" as contained in the statute was vague.

More importantly, even if the government is the victim in this case, which Ms. Lawson does not concede, it must have suffered a loss as a direct result of the defendant's offense. There is a difference between a loss suffered and a voluntary expenditure.

*Loss/Direct Result*

Any loss for which restitution is ordered must result directly from the defendant's offense. *U.S. v. Salcedo-Lopez*, 907 F.2d 97, 98 (9th Cir. 1990) (citing *United States v. Kenney*, 789 F.2d 783, 784 (9th Cir.1986) (internal citations omitted)). As the government concedes, the costs of investigating and prosecuting an offense are not direct losses for which restitution may be ordered. *Id. Government's Motion for Restitution*, Ct. doc. 259, p.5 (citing, *United States v. Meacham*, 27 F.3d 214, 218 (6th Cir. 1994).

In this case, the transportation and quarantine costs of the monkey were the result of the United State's Attorney's Office decision to preserve evidence.

Agent Corky Roberts of USFW reports that he contacted Dr. Ron Worley of the Washington State Health Department on December 27, 2007 and again on January 3, 2008, requesting information on quarantine facilities. Discovery, p. 37. Agent Roberts reports that Dr. Worley informed him that the best method of dealing with the primate in order to protect the public health would be to have it euthanized. Discovery, p. 37. This was prior to the execution of the search warrant where federal agents seized the monkey.

Agent Roberts reports that he called AUSA Earl Hicks on January 4, 2008, and explained the difficulties of finding a quarantine facility. According to Agent Roberts' report, "AUSA Hicks checked with Tom Rice, First Assistant AUSA." "Rice said the Federal Rules of Criminal Procedure require that evidence be preserved intact." Discovery, p.39. "Hicks said case law does not allow the government to use state law (Dangerous Animals Act) to circumvent the Federal Rules of Criminal Procedure in the absence of a court order." [3] Discovery p. 39.

According to the government's report of the investigation of this case, it is evident that the decision not to euthanize was based on a desire to preserve evidence in furtherance of the prosecution of the case. As such, the costs associated with the subsequent transportation and quarantine are not losses, but rather money the Government chose to spend in the course of prosecution. *U.S. v. Salcedo-Lopez*, 907 F.2d at 99. The Government is not entitled to restitution.

---

[3] Agent Roberts also contacted the Center for Disease Control about euthanizing the monkey, however, the CDC indicated it did not want to participate in euthanization for fear of "media backlash." Discovery, p.39.

Although, the ultimate prosecution costs to the taxpayers in this case are not yet known, the majority of the costs stemmed from the Government's actions **after** it was aware that the monkey posed no health threat to the public.

The Government's prosecuting decisions, in a case where all three co-defendants in a victimless crime offered to plead to a misdemeanor, led to excessive costs. The United States' Attorneys Office arguably doubled the expense of time and resources when it chose to employ two federal agencies, instead of one, because Agent Roberts of the USFW requested the opportunity to participate in an unusual case and to have the opportunity to practice testifying in federal court.

Agent Roberts is not local and had to travel from the Tri-Cities for investigation, court preparation, grand jury testimony, and trial. The government presented the case to two separate grand juries, called several witnesses who had to travel from other districts to testify at trial, including Agent Roberts, State Agent Furrer, Agent Goessman, and Edmond Choi, the Google witness from California.

Prior to trial, several of these witnesses undoubtedly spent dozens of hours in preparation. Aside from the witnesses who testified, the government employed the services of a primate expert and a handwriting expert.

Further, there are also the costs of three court appointed defense attorneys who have spent hundreds of hours researching and briefing the myriad of legal issues associated with this case, notwithstanding the other aspects of trial preparation including, but not limited to, interviewing witnesses, reviewing discovery, preparing motions in limine, voir dire, jury instructions, cross-examination questions, client meetings, and responding in this memorandum to the government's request for jail time, the maximum fine, and restitution.

This does not take into account the Court's time on the bench presiding over motions hearings and trial, as well as the many hours spent reviewing the briefings, researching the issues presented, and preparing opinions and rulings.

Moreover, the time and expense incurred by members of the jury who missed time from work and family must also be considered.

Finally, there is the cost of the time incurred by the AUSA and support staff.

The US Attorney's Office has a great deal of charging discretion. In exercising its discretion, the office apparently deemed the felony conviction worth this enormous expenditure. These decisions are for the Government to make and it got what it paid for; Ms. Lawson has two felony convictions. She should not now be required to help refill their coffers through restitution.

## II.     18 U.S.C. §3553(a)

"The overarching statutory charge for a district court is to "impose a sentence **sufficient, but not greater than necessary**" to reflect the **seriousness of the offense**, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a) and (a)(2). *United States v. Carty*, 520 F.3d 984 at 991, (**emphasis added**).

The factors to be considered are the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims. *Id*.

**A.     Nature and Circumstances of the Offense**

The underlying conduct as set forth in this case was very simple.  Ms. Lawson and her mother brought a baby monkey back to the United States from Asia.  Ms. Lawson is young and unsophisticated.  Her motivations were juvenile and arguably, as the Government states, "selfish", but they were not malicious.  Her motivation was her desire to adopt a monkey.  Ms. Lawson did not believe her actions would negatively affect anyone else.  While, the journals and emails admitted during trial, as the Government states, reflect a certain disregard for authority, Ms. Lawson did not author them.  Further, Ms. Lawson did not believe her actions harmed or had the potential to harm anyone.

**B.     History and Characteristics**

As stated in the PSR, Ms. Lawson left her mother's home when she was 15 years old.  Just prior to her departure, Ms. Lawson and her mother were involved in verbal confrontation that escalated into a physical altercation.  Although Ms. Lawson was the one arrested, she submits that her mother was also assaultive.  Ms. Lawson did not want to live with her mother at that time and believes that her mother suffered, and still does, from some type of undiagnosed mental illness.

Ms. Lawson was placed into foster care and lived with Ms. Beatriz Shults for three years.  Ms. Lawson's life was much less stressful during this period and she was happy to be with Ms. Shults.

Shortly after her foster placement ended, Ms. Lawson and Mr. Pratt began a relationship and have lived together for the past nine years in Spokane.  The two had a menagerie of pets because of Ms. Lawson's love of animals.

The government argues that while defendants do not have a criminal history, "it is clear from the evidence that they have engaged in this conduct previously."  NRPSR, p. 6.  This is inaccurate in regards to Ms. Lawson, and actually, it appears that the government is referring to Ms. Ogren.  "From Defendant Ogren's journals

and e-mails, she makes repeated reference to not only smuggling in additional items from Thailand aside from the monkey, but she also references past trips where she has been successful in smuggling unclaimed items and that she was getting too old for this conduct anymore." *Id*.

Recently, the couple was evicted from their home. Ms. Lawson submits that the couple made rental payments towards the eventual purchase of the house. After several years of this arrangement the owner told the couple he wanted to sell the house outright and since they could not afford to buy it immediately, he put it on the market.

Relying on poor legal advice, the couple stopped paying rent during this dispute, but later learned that they could have sued to enforce the rent-to-own contract had they continued paying rent. As a result they were evicted this fall and now live on a trailer in Coleville on property belonging to Mr. Pratt's parents. Ms. Lawson hopes this is a temporary situation.

**C.** **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment.**

*Seriousness of the Offense*

While Ms. Lawson's conduct had the "potential" to be more serious than it was, the fact remains that her actions did not harm anyone. The Government, justifiably so, has stated that there was a great potential for harm if the monkey had, in fact, been infected with a disease. However, the evidence shows that the monkey was not infected and Ms. Lawson should not be punished for the potential of harm that did not exist. If the monkey had been infected, then there would have been the potential of harm to others. Since there was no infection, there was no potential of harm. Not that Ms. Lawson is to be credited for her actions in this

case, however, she should not be condemned for disastrous events that did not happen.

Moreover, the Government's evidence showed that Ms. Lawson took the monkey to a veterinarian in Asia and that she also had it tested and received confirmation from the veterinarian that the monkey was healthy. E.R. 244-245. She also received documentation confirming the monkey was healthy; unfortunately, Mr. Pratt burned these records because they were "evidence." E.R. 245, 250.

Ms. Lawson readily agrees that the Government had a legitimate basis for its concerns for the public health prior to the Center for Disease Controls final report on the money's health. However, Ms. Lawson submits that the Government has created an illusion that Ms. Lawson's offense was much more serious than it was in reality, especially since Ms. Lawson was not indicted until the quarantine period had expired and the CDC would have known the monkey never posed a threat to the public health. It appears the Government seeks to justify this extensive and costly prosecution on this stated claim.

The Government cries:

If this monkey had been infected, think of the various flights the Defendants took with this monkey, the various airports they entered with this monkey, hidden under their shirt, exposing hundreds of people from all over the world, that could have been infected with a number of different communicable diseases. Then think of where they would have traveled throughout the world, carrying whatever they were exposed to into their communities. It is not over dramatic or drastic to carry this case out to its logical conclusions..." NRPSR, p. 5, ln. 20 – 28.

However, the Government's actions have not always corresponded to this stated concern for the public health. For instance, Agent McClain testified that he was very concerned about the health risks to the other passengers on January 4, 2008, when he confirmed the flight itineraries of Ms. Lawson and Ms. Ogren. E.R. 422-423. However, the Agent never once tried to contact a single person from those flights regarding a possible health risk. The Agent never once called a single person from those flights to inform them of the need to seek immediate medical attention. This failure to act is inconsistent with the Government's dramatic claims of possible epidemic.

It only seems logical that the Government would want to contact the other passengers as soon as possible in order to avoid any further spread of an Ebola or herpes virus epidemic. Every second would count and yet Agent McClain did not attempt to contact a single person from the passenger manifests of the flights. This makes no sense in light of the Government's extreme concerns for the public. This inaction also makes the Government's present claim for an upward departure and maximum fine now seem somewhat hypocritical.

This alarmist rhetoric has been a continuing theme during the Government's prosecution of Ms. Lawson, even after the CDC found that the monkey did not pose any threat to the public health. At trial Agent Roberts testified that the quarantine period lasted 31 days. It is uncontested that the monkey was seized on January 11, 2008, and transported immediately to the CDC for quarantine. Although the government never provided the final health report from the CDC, according to Agent Roberts' calculations, the CDC should have known the monkey was not infected and informed the Government sometime around the middle of February 2008. After this date, the Government no longer had a credible argument about a public health threat. In fact, Ms. Lawson was not

indicted until March 3, 2008, and she was not charged with any crime related to creating the potential of a public epidemic.

Yet, the Government continued to justify its excessive prosecution of this case on an illusion of a potential public epidemic. Mr. Pratt testified that AUSA Van Marter told him, during an interview prior to trial, that the monkey was in fact infected with the Herpes B virus.

AUSA Van Marter:     Were you told what happened to Apoo?

Mr. Pratt:     Yes.

Van Marter:     By whom?

Mr. Pratt:     By you.

Van Marter:     What were you told?

Pratt:     Um, you told me that he was, the last picture you got he was in a tub playing with something and was doing good.

Van Marter:     And, so, and those conversations you were aware that Apoo was alive?

Pratt:     Yup.

Van Marter:     And you were also told, that were you told if he was ever tested after he left your house?

(Objections)

Van Marter:     Were you—what were you told about Apoo being tested?

Pratt:     That he had been tested and has Herpes B.

E.R. 291-292.

The underlying conduct in this case has been distorted into a creation of the Government's own invention. In reality, the reasonable punishment is one that is commensurate with the actual offense - - the offense the Government seeks to punish in this case never happened.

*Respect for the Law*

The government argues that Ms. Lawson's "complete disregard for a number of laws should cause the Court concern in its obligation to promote respect for the law." NRPSR, p. 6. However, this factor is generally analyzed in terms of repeat offenders or defendants who have committed the same type of offense on more than one occasion. Ms. Lawson has a criminal category of I, with absolutely no prior history remotely similar to this offense. Moreover, almost all criminal convictions based on volitional acts can be said to demonstrate a lack of respect for the law. This case is no different, however, Ms. Lawson does not need additional punishment to learn respect for the law. In fact, her conduct during the pendency of this case demonstrates a respect for the law.

Agent Furrer testified that Ms. Lawson was cooperative with law enforcement once they entered her house while executing the warrant. She abided by their commands and actually helped them after their initial unsuccessful search. Further, Ms. Lawson has been on conditions of release for over a year now. In that time she has never had a violation report. The one time she sought to vary from the conditions, she appropriately contacted counsel first and successfully moved the Magistrate to modify the conditions.

Accordingly, this factor favors Ms. Lawson's request for the imposition of a sentence of probation.

*Just Punishment*

There are several types of punishment and Ms. Lawson respectfully submits that she has been sufficiently punished for her actions. She has been convicted of two felony counts and as a result has lost many rights, including the right to vote. She was arrested and taken to jail. Although she was released, her freedoms have been curtailed by pretrial conditions of release. Moreover, she has also been held

out to public ridicule and condemnation due, in part, to the Government's press release, which again included the theme of the public health hazard.

The day of the verdict, and obviously prior to the conclusion of this case, the Government issued its press release, which in part, stated:

> The callousness and intent these people showed in carrying out their plan was egregious and placed at risk not only wildlife but potentially the health of other passengers on the plane and in their community," said Paul Chang, Special Agent in Charge of Law Enforcement for the Pacific Region of the U.S. Fish and Wildlife Service. "These animals are known carriers of viruses and parasites that can be transmitted to humans, although this particular animal tested negative."

The release also stated:

> James A. McDevitt, U.S. Attorney for the Eastern District of Washington, said, " The investigation and prosecution of this case highlights the partnerships between this Office, the U.S. Fish and Wildlife Service, the Immigration and Customs Enforcement, as well as our international partner, the Royal Thai Police. These defendants purposely undertook a course of action which could well have endangered many citizens, as well as the life of the animal in question."

*Press Release, Monday, December 08, 2008.*

Accordingly, Ms. Lawson submits that she had already suffered consequences to her behavior. Further, a sentence of one year of probation is "sufficient, but not greater than necessary," to comport with the directives of section 3553(a).

*Sentencing Disparity*

The Government argues that Mr. Pratt should receive a sentence of probation and that Ms. Lawson should receive a minimum of 6 months

imprisonment and this would not lead to disparate sentences. NRPIR, p. 7, ln. 14 – 25. In support of the argument, the Government submits that Mr. Pratt is less culpable than Ms. Lawson and that Mr. Pratt cooperated with the Government and testified against Ms. Lawson and Ms. Ogren.

Mr. Pratt was initially charged with three felony counts; (1) Conspiracy to Smuggle, (2) Receive, Conceal, and Facilitate the Transportation, and (3) Making a False Statement. If Mr. Pratt was less culpable, the Government's charging decision does not reflect this belief. More importantly, if Mr. Pratt would have been convicted of these charges, he would have faced a guidelines range higher than 0 to 6 months faced by Ms. Lawson because of his prior criminal history.

Fortunately for Mr. Pratt, the Government agreed to let him plead to a superseding information charging him with a misdemeanor and agreed to recommend no jail time. In return, all Mr. Pratt had to do was testify against his common law wife and her mother. It's not as if Mr. Pratt did so at great risk to his safety or his life. Mr. Pratt did what he needed to do in order to save his own neck.

Ms. Lawson does begrudge Mr. Pratt's resolution to his case, she merely points out the disparity of the Government's sentencing recommendations and moves the Court to impose a sentence of one year of probation.

Mr. Pratt also admitted to destroying evidence of the veterinary records Ms. Lawson obtained for the monkey in Asia, however, he was not charged with this offense. There was no evidence that Ms. Lawson had anything to do with this type of conduct, which furthers her position that the Government is indeed recommending disparate sentences for these two similarly situated co-defendants.

## III. CONCLUSION

Based upon the foregoing, Ms. Lawson respectfully moves the Court to impose a sentence of one year of probation on each count, to run concurrently, and to impose no fine and no restitution.

Dated: April 13, 2009

Respectfully Submitted,


*s/Kimberly A. Deater*
Kimberly A. Deater
WA 28230
deaterk@hotmail.com
Attorney for Lawson

CERTIFICATION

I hereby certify that on April 13, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Ms. Stephanie Van Marter
Assistant United States Attorney
Eastern District of Washington
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

*s/Kimberly A. Deater*
Kimberly A. Deater
Attorney for Lawson